**Andrea Pia YATES, Appellant,**

v.

**The STATE of TEXAS, Appellee.**

**Nos. 01–02–00462–CR, 01–02–00463–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 6, 2005.

Rehearing Overruled April 7, 2005.

Discretionary Review Refused
Nov. 9, 2005.

garding appellant's continuing threat to society "No," assessed punishment at life in prison. Following the verdict and before the punishment phase of the trial, appellant learned that the State's expert witness, Dr. Park Dietz, had presented false testimony. Appellant moved for mistrial, but the trial court denied the motion. Appellant asserts 19 points of error in which she challenges, among other things, the factual sufficiency of the evidence to support the verdict rejecting the insanity defense, the denial of a motion for mistrial based on false testimony, and the denial of her right to due process by the use of false or perjured testimony. We reverse and remand.

Daucie Elana Shefman, Wendell Odom, George J. Parnham, W. Troy McKinney, Schneider & McKinney, P.C., Houston, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney—Harris County, Alan Curry, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices TAFT and NUCHIA.

## OPINION

SAM NUCHIA, Justice.

Appellant, Andrea Pia Yates, was charged by two indictments with capital murder for the drowning deaths of three of her five children.[1] Rejecting appellant's insanity defense, the jury found her guilty and, having answered the special issue re-

## BACKGROUND

Appellant and Russell Yates (Yates) were married on April 17, 1993. Their first child, Noah, was born in February 1994; their second child, John, was born in December 1995; and their third child, Paul, was born in September 1997. During this time, the Yates family moved from Friendswood to Florida and back to the Houston area, living in a recreational vehicle. In 1998, they moved from the recreational vehicle to a converted bus and continued to live in a trailer park. At one point, appellant told her husband she felt depressed and overwhelmed, and he suggested that she talk to her mother and a friend.

In February 1999, a fourth child, Luke, was born. On June 18, 1999, appellant suffered severe depression and tried to commit suicide by taking an overdose of

---

1. Appellant was charged in cause number 880205 with intentionally and knowingly causing the deaths of Noah Yates and John Yates. *See* TEX. PEN.CODE ANN. § 19.03(a)(7)(A) (Vernon Supp.2004–2005) (providing that murder of more than one person in same transaction is capital murder). Appellant was charged in cause number 883590 with intentionally and knowingly causing the death of Mary Yates. *See* TEX. PEN.CODE ANN. § 19.03(a)(8) (Vernon Supp.2004–2005) (providing that murder of an individual under six years of age is capital murder).

an antidepressant that had been prescribed for her father. She was admitted to the psychiatric unit of Methodist Hospital. After her release six days later, she began seeing a psychiatrist, Dr. Eileen Starbranch, as an outpatient. On July 20, 1999, Yates found appellant in the bathroom, holding a knife to her neck. Dr. Starbranch recommended that appellant be admitted to Spring Shadows Glen Hospital. Appellant was admitted, against her wishes, the next day. At Spring Shadows Glen, appellant told a psychologist, Dr. James Thompson, that she had had visions and had heard voices since the birth of her first child. Dr. Starbranch ranked appellant, at the time of her admission to Spring Shadows Glen, among the five sickest patients she had ever seen. Before discharging appellant from the hospital, Dr. Starbranch told appellant and Yates that appellant had a high risk of another psychotic episode if she had another baby.

In August 1999, the Yates family moved from the converted bus to a house that Yates had bought while appellant was in the hospital. That fall, appellant began home-schooling Noah. Appellant saw Dr. Starbranch for the last time on January 12, 2000. She told Dr. Starbranch that she had stopped taking her medication in November 1999. In November 2000, appellant's fifth child, Mary, was born. In March 2001, appellant's father died. This death seemed to precipitate a decline in appellant's functioning, and she began to suffer from depression. On March 28, 2001, Yates contacted Dr. Starbranch and told her that appellant was ill again. Dr. Starbranch wanted to see appellant immediately, but Yates said he could not bring her in until the next Monday.

Appellant was not taken to Dr. Starbranch's office, but was admitted to Devereux Hospital in League City on March 31, 2001. There, she was observed as being catatonic or nearly catatonic and possibly delusional or having bizarre thoughts. She was treated by Dr. Mohammed Saeed and was placed on a suicide watch. Appellant was discharged on April 13, 2001 upon her own and Yates's request. She began an outpatient program at Devereux, and Dr. Saeed recommended that someone stay with her at all times and that she not be left alone with her children.

On April 19, Yates's mother came for a visit. She had intended to stay for about one week, but, when Yates told his mother that appellant was suffering from depression, his mother decided to stay longer and moved to a nearby extended-stay hotel.

Yates's mother went to appellant's home every day. She observed that appellant was almost catatonic, did not respond to conversation or made a delayed response, stared into space, trembled, scratched her head until she created bald spots, and did not eat. On May 3, appellant filled a bathtub with water, but could not give a good reason for doing so. When asked, she said, "I might need it." On May 4, appellant was re-admitted to Devereux, and on May 14, she was discharged, seeming to be better. Dr. Saeed had prescribed the medication, Haldol, and appellant continued to take it after her discharge. Dr. Saeed also recommended electroconvulsive therapy, but appellant rejected that recommendation.

After her second discharge from Devereux, appellant was able to take care of her children, but was still uncommunicative and withdrawn. She smiled infrequently and seemed to have no emotions, but Yates did not think it was unsafe to leave her alone with the children. On June 4, appellant had a follow-up appointment with Dr. Saeed, who decided to taper her off of Haldol. Appellant denied having any suicidal or psychotic thoughts. Appellant met with Dr. Saeed again on June 18, and

she again denied having any psychotic symptoms or suicidal thoughts. She was no longer taking Haldol, and Dr. Saeed adjusted the dosages of her other anti-depressant medications.

On June 20, 2001, at 9:48 a.m., appellant called 9–1–1 and told the operator, Sylvia Morris, that she needed the police. Morris transferred the call to the Houston Police Department, and appellant told the police operator that she needed a police officer to come to her home. Appellant also called Yates at his work and told him that he needed to come home, but would not say why. As Yates was leaving, he called her and asked if anyone was hurt, and she said that the kids were hurt. He asked, "Which ones?" She responded, "All of them."

Within minutes of appellant's 9–1–1 call, several police officers arrived at appellant's home. They discovered four dead children, soaking wet and covered with a sheet, lying on appellant's bed. The fifth child, Noah, was still in the bathtub, floating face down. Appellant was quiet and cooperative with the police officers.

At trial, ten psychiatrists and two psychologists testified regarding appellant's mental illness. Four of the psychiatrists and one of the psychologists had treated appellant either in a medical facility or as a private patient before June 20, 2001. They testified regarding the symptoms, severity, and treatment of appellant's mental illness. Five psychiatrists and one psychologist saw appellant on or soon after June 20 for assessment and/or treatment of her mental illness. Four of these five psychiatrists and the psychologist testified, in addition to their observations and opinions regarding appellant's mental illness,

that appellant, on June 20, 2001, did not know right from wrong, was incapable of knowing what she did was wrong, or believed that her acts were right.[2]

The tenth psychiatrist, Dr. Park Dietz, who interviewed appellant and was the State's sole mental-health expert in the case, testified that appellant, although psychotic on June 20, knew that what she did was wrong. Dr. Dietz reasoned that because appellant indicated that her thoughts were coming from Satan, she must have known they were wrong; that if she believed she was saving the children, she would have shared her plan with others rather than hide it as she did; that if she really believed that Satan was going to harm the children, she would have called the police or a pastor or would have sent the children away; and that she covered the bodies out of guilt or shame.

On cross-examination, appellant's counsel asked Dr. Dietz about his consulting work with the television show, "Law & Order," which appellant was known to watch. The testimony was as follows:

Q. Now, you are, are you not, a consultant on the television program known as "Law & Order"?

A. Two of them.

Q. Okay. Did either one of those deal with postpartum depression or women's mental health?

A. As a matter of fact, there was a show of a woman with postpartum depression who drowned her children in the bathtub and was found insane and it was aired shortly before the crime occurred.

The second mention of "Law & Order" came during Dr. Lucy Puryear's testimo-

2. The fifth psychiatrist in this group, Dr. Melissa Ferguson, testified that she had not made a determination regarding appellants ability to know whether her actions were wrong. However, she testified that appellant made the statement that, in the context that the children would perish in the fires of hell, [their drowning] was the right thing to do.

ny. Dr. Puryear, a defense expert witness, was cross-examined by the State regarding her evaluation of appellant. The State specifically asked about her failure to inquire into whether or not appellant had seen "Law & Order." Dr. Puryear testified as follows:

Q. You know she watched "Law & Order" a lot; right?

A. I didn't know. No.

Q. Did you know that in the weeks before June 20th, there was a "Law & Order" episode where a woman killed her children by drowning them in a bathtub, was defended on the basis of whether she was sane or insane under the law, and the diagnosis was postpartum depression and in the program the person was found insane, not guilty by reason of insanity? Did you know that?

A. No.

Q. If you had known that and had known that Andrea Yates was subject to these delusions, not that she was the subject of a delusion of reference, but that she regularly watched "Law & Order" and may have seen that episode, would you have changed the way you went about interviewing her, would you have interviewed whether she got the idea somehow she could do this and not suffer hell or prison?

A. I certainly wouldn't have asked her that question. No.

Q. Would you have—you didn't have to ask her that question, but you could have explored that?

A. If I had known she watched that show, I would have ask[ed] her about it, yes.

In his final argument at the guilt-innocence phase of the trial, appellant's attorney referred to Dr. Dietz's testimony by stating, "Or maybe even we heard some evidence that she saw some show on TV and knew she could drown her children and get away with it."

The prosecutor, in his final argument, made the following reference to Dietz's testimony about the "Law & Order" episode:

She gets very depressed and goes into Devereux. And at times she says these thoughts came to her during that month. These thoughts came to her, and she watches "Law & Order" regularly, she sees this program. There is a way out. She tells that to Dr. Dietz. A way out.

After the jury had returned a guilty verdict, appellant's counsel discovered that Dr. Dietz had given false testimony. The producer of "Law & Order" spoke to counsel by telephone and said he could not recall such an episode. An attorney representing the producer, after talking to Dr. Dietz and researching the shows, verified to counsel that there was no show with a plot as outlined by Dr. Dietz. Dr. Dietz acknowledged that he had made an error in his testimony.[3] Appellant and the State entered into the following written stipulation:

1. Dr. Park Dietz testified on cross-examination that "As a matter of fact, there was a show of a woman with postpartum depression who drowned her children in the bathtub and was found insane and it was aired shortly before this crime occurred."

2. Dr. Park Dietz would testify that he was in error and that no episode of "Law & Order" and/or "Law & Or-

---

3. Dr. Dietz's acknowledgment is not on the record. The record is unclear as to whether it was made to the attorney representing the producer or to appellant's counsel.

der: Criminal Intent" as described above was ever produced for the "Law & Order" television series.

Appellant moved for a mistrial based on Dr. Dietz's false testimony, and the trial court denied the motion. Appellant then requested that the stipulation be admitted into evidence and read to the jury. The trial court granted this request. In connection with the stipulation, the trial court, in response to appellant's request, made the following statement to the jury:

> Ladies and gentlemen, during the course of this trial there have been occasions when written stipulations have been introduced for your consideration.... While those witnesses that give information which is contained in this stipulation do not physically appear here in court to testify, you must consider the matters which they have indicated in the written stipulation as if they actually appeared in court and give it whatever weight you wish to give to it. So the witness does not have to actually appear in court, but the matters contained in the stipulation are offered into evidence as if they had appeared.

The jury returned verdicts on both charges that at least 10 jurors had a reasonable doubt that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

## DISCUSSION

### Motion for Mistrial

In her second point of error, appellant contends that the trial court abused its discretion by denying her motion for mistrial when it was revealed that the State's expert witness had presented false testimony. Appellant argues that Dr. Dietz's testimony was essential to the jury's "guilty" verdict and that his testimony relating to the "Law & Order" episode was the most compelling testimony supporting Dr. Dietz's conclusion that appellant knew right from wrong.

The State recognizes that the State's knowing use of perjured testimony that is likely to materially affect the judgment violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *See Ex parte Castellano,* 863 S.W.2d 476, 485 (Tex.Crim.App. 1993). The State argues that it did not *know* that the testimony was false, did not *use* the false information, and the information was not *material.* We agree that this case does not involve the State's knowing use of perjured testimony. At the hearing on appellant's motion for mistrial, appellant did not complain that there had been prosecutorial misconduct. Rather, appellant stated,

> [M]ake no mistake, the issue is not whether or not the State was aware and we have no reason to believe the State was aware that such a program did not exist. The issue is that the defense of insanity was rebutted by the testimony of Dr. Dietz relative to an act of premeditation, that is a planned and/or a deceptive act on Mrs. Yates' part, that is something that would give her an idea, a way out of these particular allegations. And that was relayed to this jury and we believe that the jury relied upon the presentation of Dr. Dietz as well as the cross-examination by [the State's attorney] of Dr. Puryear relative to this particular issue.

■ We review the denial of a motion for mistrial under an abuse of discretion standard. *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App.1999). In this case, the motion for mistrial was the functional equivalent of a motion for new trial; therefore, we look to the standards governing the review of the granting or denial of a motion for new trial. *See State v. Garza,*

774 S.W.2d 724, 726 (Corpus Christi 1989, pet. ref'd) (concluding that State may appeal order granting mistrial that is functionally indistinguishable from order granting motion for new trial).

■ Generally, if a witness has testified to material, inculpatory facts against a defendant and, after the verdict but before a motion for new trial has been ruled upon, the witness makes an affidavit that he testified falsely, a new trial should be granted.[4] *Williams v. State*, 375 S.W.2d 449, 451 (Tex.Crim.App.1964). The exceptions to this rule—such as, when the recanting witness is an accomplice, or the recantation is found to be incredible in light of the evidence, or the recantation has been coerced—do not apply in the present case. *See Villarreal v. State*, 788 S.W.2d 672, 674 (Tex.App.-Corpus Christi 1990, pet. ref'd) (applying general rule to determine that, because State offered no evidence to controvert recantation or testimony, denial of motion for new trial was abuse of discretion). We note that this rule does not require that the State have knowledge that the testimony was false. We review the record to determine whether the State used the false testimony and, if so, whether there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. *See Ramirez v. State*, 96 S.W.3d 386, 394–95 (Tex.App.-Austin 2002, pet. ref'd).[5]

■ It is uncontested that the testimony of Dr. Dietz regarding his consultation on a "Law & Order" television show having a plot remarkably similar to the acts committed by appellant was untrue and that there was no "Law & Order" television show with such a plot. The State is bound by its stipulation to these facts. *See Dougherty v. State*, 745 S.W.2d 107, 107 (Tex.App.-Amarillo 1988), *aff'd*, 773 S.W.2d 320 (Tex.Crim.App.1989) (stating that State was bound by its stipulation). However, the State asserts that it is "very questionable whether it can be said that the trial prosecutors *used* Dr. Dietz' testimony on cross-examination, especially in light of the fact that it played absolutely no role in the development of Dr. Dietz' conclusion that the appellant knew that her conduct was wrong . . . ."

The record reflects that the State used Dr. Dietz's testimony twice. First, the State used the testimony to cross-examine Dr. Puryear, who had seen appellant for several months while appellant was in the county jail, asking Dr. Puryear whether she knew that appellant watched "Law & Order" and whether she knew that there was an episode with a plot line mirroring appellant's acts. In so doing, the State repeated those facts that were common to appellant's acts and the referenced episode, thus emphasizing those facts already stated by Dr. Dietz. Second, the State connected the dots in its final argument by juxtaposing appellant's depression, her dark thoughts, watching "Law & Order," and seeing "a way out." Thus, the State used Dr. Dietz's false testimony to suggest

4. In our case, Dr. Dietz did not make an affidavit that he testified falsely. However, because the State stipulated that Dr. Dietz would testify that his testimony was in error, there is no credibility issue requiring an affidavit. *See Dougherty v. State*, 745 S.W.2d 107, 107 (Tex.App.-Amarillo 1988), *aff'd*, 773 S.W.2d 320 (Tex.Crim.App.1989) (stating that State was bound by its stipulation).

5. We recognize that *Ramirez v. State* involved the prosecutor's knowing use of false testimony. 96 S.W.3d 386, 393 (Tex.App.-Austin 2002, pet. ref'd). However, when false testimony is a factor in securing a conviction, the effect is the same, regardless of whether the State used the false testimony knowingly or not. *See Trujillo v. State*, 757 S.W.2d 169, 172 n. 1 (Tex.App.-San Antonio 1988, no pet.) (Cadena, C.J.concurring).

to the jury that appellant patterned her actions after that "Law & Order" episode. We emphasize that the State's use of Dr. Dietz's false testimony was not prosecutorial misconduct. Rather, it served to give weight to that testimony.

The State argues that Dr. Dietz's testimony regarding the "Law & Order" episode was not material. The State asserts that "there is no reasonable likelihood" that the testimony "could have affected the judgment of the jury," but does not make any argument to support such a conclusory statement. We conclude that the testimony, combined with the State's cross-examination of Dr. Puryear and closing argument, was material. The materiality of the testimony is further evidenced by the fact that appellant's attorney felt compelled to address it in his own closing argument.

The State also asserts that Dr. Dietz did not suggest that appellant used the plot of the show to plan killing her children. Although it is true that Dr. Dietz did not make such a suggestion, the State did in its closing argument.

Five mental health experts testified that appellant did not know right from wrong or that she thought what she did was right. Dr. Dietz was the only mental health expert who testified that appellant knew right from wrong. Therefore, his testimony was critical to establish the State's case. Although the record does not show that Dr. Dietz intentionally lied in his testimony, his false testimony undoubtedly gave greater weight to his opinion.[6]

We conclude that there is a reasonable likelihood that Dr. Dietz's false testimony could have affected the judgment of the jury. We further conclude that Dr. Dietz's false testimony affected the substantial rights of appellant. Therefore, the trial court abused its discretion in denying appellant's motion for mistrial.

Accordingly, we sustain appellant's second issue.

## CONCLUSION

Having sustained appellant's second issue, we need not reach her other issues. We reverse the trial court's judgment and remand the cause for further proceedings.

---

**6.** On the other hand, had the jury known prior to their deliberations in the guilt-innocence phase of the trial, that Dr. Dietz's testimony regarding the "Law & Order" episode was false, the jury would likely have considered him, the State's only mental health expert, to be less credible.