

**NUMBER 13-09-00042-CR**

# COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

EDWARD CANO A/K/A EDWARDO CANO
A/K/A EDUARD CANO A/K/A EDUARDO
CANO,                                                          Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

---

### On appeal from the 370th District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza**
**Memorandum Opinion by Chief Justice Valdez**

After a jury trial, appellant, Edward Cano a/k/a Edwardo Cano a/k/a Eduard Cano

a/k/a Eduardo Cano, was convicted of three counts of aggravated sexual assault of a child,

a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(1)(B)(iii),

(a)(2)(B), (e) (Vernon Supp. 2009). Cano was sentenced to twenty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice for each count, and the punishment for each of the counts was ordered to run concurrently. By four issues, Cano argues that: (1) the evidence supporting his conviction is legally and factually insufficient; (2) he received ineffective assistance of counsel; (3) the evidence establishing the corpus delecti of the offense is insufficient; and (4) the trial court erred in failing to grant him a hearing on his motion for new trial because the victim allegedly recanted her testimony. We affirm.

## I. Background

On January 16, 2008, Cano was charged by indictment with three counts of aggravated sexual assault,[1] one count of indecency with a child by contact, a second-degree felony, and one count of indecency with a child by exposure, a third-degree felony. *See* TEX. PENAL CODE ANN. §§ 21.11(a)(1), (a)(2)(A), (d) (Vernon Supp. 2009), 22.021(a)(1)(B)(iii), (a)(2)(B), (e). Each of the counts pertained to an incident that allegedly occurred on or about October 9, 2007.

On September 23, 2008, the trial on this matter commenced. The State called several witnesses to testify as to the incident and the subsequent investigation, including the victim, E.C., Cano's then thirteen-year-old daughter; E.C.'s mother, J.C[2]; Elvira Mungia, a registered nurse; Vanessa G. Nelson, a DNA supervisor at the Texas Department of Public Safety crime lab; and one of the investigating officers, Jorge Espinoza. Cano called

---

[1] The first aggravated assault count alleged that Cano caused his finger to penetrate E.C.'s sexual organ; the second aggravated assault count alleged that Cano caused his sexual organ to contact E.C.'s sexual organ; and the third aggravated assault count alleged that Cano used his mouth to contact E.C.'s sexual organ. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(1)(B)(iii) (Vernon Supp. 2009).

[2] To protect the mother's and child's privacy, we refer to the mother and child by their initials. *See* TEX. R. APP. P. 9.8(b)(2).

2

two witnesses to testify on his behalf: his brother-in-law, Esteban Espinoza, and Raul G. Reyna Jr., a private investigator hired by Cano's defense team.

## A. The State's Evidence

E.C. testified that, at the time of the incident, she was a thirteen-year-old eighth grader who played volleyball for her middle school. E.C. stated that she had played in a volleyball game on the night of the incident and that her mother had picked her up once the game was over. After picking her up, E.C.'s mother brought E.C. home to eat. Upon arriving home, E.C. saw Cano drinking a Bud Light, which E.C. stated was often the case because Cano was "a drinker." E.C. recalled that Cano appeared to be drunk. In any event, E.C. ate dinner and then took a shower. Once she finished showering, E.C. fell asleep. She remembered being very tired that day because she had played in the volleyball game, and she had run one-and-a-half miles for the cross-country team during her athletics class.

E.C. described the layout of the family house as being two stories with only one room where her parents slept. E.C. testified that the second story of the house is where her oldest brother sleeps and where the bathroom is located. E.C. further testified that she does not have a room and that her bed is located in the living room of the house where the family's only television is located. E.C. estimated that her bed is approximately fourteen feet away from where her parents sleep and noted that her parents cannot see her bed from their bedroom because curtains obscure the view. E.C. stated that the house is very dark at night. When asked about how she likes to sleep, E.C. stated that she likes to sleep facing up.

Next, E.C. testified that she woke up in the middle of the night because she "felt something pushing against [her]" while she was lying on her back. E.C. further testified that she was wearing her volleyball practice clothes and her underwear and bra when she fell asleep that night. She also noted that when she went to sleep that night she had fallen asleep facing down. When she awoke, her shorts and underwear were at her feet and Cano was on top of her. E.C. asked Cano what he was doing, and he told her "Nothing, Nothing" and "I love you." E.C. then pushed Cano off of her and told him, "If you loved me, you wouldn't be doing this." When asked for more specifics regarding the alleged assault, E.C. remembered that Cano was wearing a work shirt and red Dickie shorts which were unzipped. E.C. also remembered feeling Cano's penis "going in and out of [her] pussy and [her] behind" and that Cano's hands were all over her. E.C. testified that Cano's penis felt "soft" and "gross" and that her genitals were "wet."

After E.C. pushed Cano off her bed, Cano laughed and went to his bedroom. E.C. remembered crying and feeling "gross" after the alleged incident. E.C. went upstairs to take a shower. Upon exiting the shower, E.C. put on the same clothes that she had been wearing previously. E.C. then decided to write a letter to her mother regarding the incident and placed it in her mother's drawer. E.C. read the contents of the letter into the record, which stated the following:

> Mom, read with care and believe it. Mom, you have to believe me when I say this. I woke up in the middle of the night and dad [Cano] was on top of me. I told him to get off and he did. I don't know—I don't know what—what he did or did not do but please take me to get checked ASAP because I'm really scared he did do something.
>
> I seriously am begging you. Your scared to death daughter, [E.C.]

4

P.S. Mom, I know I've lied so many times[,] but you have to believe [me] on this one. My—please I'm begging you—you—you to trust [me] on this one. I love dad. I love dad and all but he needs a lot of help at this moment. So please find him some because your only daughter is asking you to. I love you and hopefully you trust on my word, mom please I really do think he did something. On top of that he was laughing when he got off of my bed but then stopped. I don't know why though. Mom please get dad the help that he needs. I'm begging you.

E.C.'s mother discovered the letter the next morning and took E.C. to the bedroom to discuss the situation with Cano. J.C. questioned E.C. and Cano about the letter, and Cano initially denied any involvement in the incident. Cano later admitted to doing something to E.C., but he did not specify what he had done at that time. Cano instructed J.C. to take E.C. to the doctor to get checked. However, before taking E.C. to get checked out, J.C. called Cano's mother to discuss the incident.

After discussing the situation with Cano's mother, J.C. took E.C. to the family doctor, Dr. Aguilera. Dr. Aguilera reported the incident to the police after hearing E.C.'s description of the alleged events. E.C. recounted her story to Hidalgo County Sheriff's Office Investigator Espinoza. Investigator Espinoza referred E.C. to Estrellita's House to be interviewed and for medical testing.

While at Estrellita's House, E.C. was examined by Mungia, a registered nurse with thirty-five years' experience. Mungia took E.C.'s statements, examined her genitals, and kept her underwear for further testing. Mungia testified that E.C. told her about the incident and stated that there was no bleeding or pain when it transpired. Mungia further testified that, based on her examination of E.C.'s genitals, the perpetrator did not use a condom or lubricant in committing the offense, nor did he ejaculate. In addition, Mungia's examination

5

of E.C.'s genitals did not yield any findings of injury, trauma, cuts, or abrasions. Mungia noted that, in many instances of sexual assault, the medical examination does not result in any findings of injury or trauma. Mungia specifically noted that "[j]ust because it is normal . . . doesn't mean it didn't happen" and that such injuries and trauma are often the result of rough sex rather than oral sex or the digital penetration of a female's vagina. Mungia took some swabs of E.C.'s mouth and vagina and obtained some of E.C.'s pubic hair and hair from her head for further testing.

Once Mungia completed her examination, E.C. was interviewed by a worker for Child Protective Services ("CPS") and a detective. E.C. once again recounted her story and informed the CPS worker and the detective that she did not feel comfortable at home because her dad still lived there. E.C. also stated that J.C. regularly took E.C. to see Cano even after the incident and that J.C. was not supportive. E.C. believed that J.C. was angry with her for making the outcry because Cano was no longer able to financially provide for the family, and the family was struggling to make ends meet.

During the course of the investigation, J.C. was ordered to take E.C. to counseling, create a room for E.C., and to prevent contact between E.C. and Cano. E.C. testified that J.C. did not want E.C. to go to counseling and that J.C. responded to CPS's request that E.C. get counseling by saying, "for what?" In addition, J.C. allegedly took E.C. to visit Cano on a number of occasions, and a room was never created for E.C. Instead, E.C. was allegedly provided J.C. and Cano's bedroom in which to sleep.

On cross-examination, E.C. testified that she resented not having her own room and that her cell phone had been disconnected. She also testified that she met with Cano's

6

defense counsel and told him that she never felt or saw anything on the night in question. However, she later stated that J.C., Cano, Cano's mother, and one of Cano's sisters had told her to lie about the incident. E.C. also admitted that she never saw Cano's penis.

J.C. testified that the letter that was read by E.C. in open court was not the letter that she had received from E.C. at the time of the incident. J.C. recalled that E.C. looked normal when J.C. confronted her about the letter; however, J.C. testified that she was worried and concerned about the letter's contents. When J.C. asked Cano about the allegations contained in the letter, Cano did not remember anything. J.C. asked Cano about the incident a few more times, and Cano denied remembering anything each time. J.C. later admitted that she made a statement to Investigator Espinoza that Cano told her that he did do "something" to E.C., but he refused to specifically state what he had done. After Cano admitted to some sort of wrongdoing, J.C. called Cano's mother even though Cano advised against it because the allegations were embarrassing. J.C. never reported the incident to the police.[3] J.C. acknowledged that Cano regularly consumed alcohol and drugs and denied that she kept E.C. from attending counseling sessions. J.C. also stated that she took E.C. to see Cano because E.C. had requested that she do so.

Nelson testified that she conducted DNA tests on all of the samples obtained by Mungia. The tests revealed no "indication of semen on the vaginal swabs" and no

---

[3] Later in the investigation, J.C. executed an affidavit, which was admitted into evidence without any objection and stated the following, among other things:

> When I first married my husband[,] I was pregnant with my oldest. My sister-in-law Elva Cano told me that she hope[d] that I did not have a girl because my husband, Eduardo[,] use[d] to touch his sisters. When I asked him about it[,] he told me that he did do it. . . . [After the incident] I called [Cano's] mom[,] and she told me to take [E.C.] to the doctor and to do whatever I have to do. My husband has a drug and drinking problem. I do wish to file charges against my husband for what he did to my daughter.

7

"spermatozoa in the microscope slide from the vaginal swabs. The same thing with the oral swabs. There was no indication of semen on the swabs, no sperm on the microscope slide." Nelson noted that there was not any other "kind of hair in the pubic hair combings and there was not an indication of semen on the panties" and there was not "any hair on the panties, either." Nelson then testified that a scraping of the crotch of E.C.'s panties was taken. The scraping was done by a clean razor blade and was intended to harvest fibers and skin and saliva cells from the panties. The testing revealed DNA from a male; however, Nelson was not able to determine the identity of the DNA in E.C.'s panties. Nelson testified that the male DNA closely resembled E.C.'s DNA, but she could not conclusively state that the DNA was Cano's because Cano and E.C.'s DNA were very difficult to differentiate since they are biologically related. Nelson admitted that only Cano and E.C. provided samples for testing.

On cross-examination, defense counsel suggested, through the questioning of Nelson, that the male DNA found in E.C.'s panties could have been transferred when the family's clothes were washed. Nelson acknowledged that she was not able to conclusively state that the source of the DNA found in E.C.'s panties was Cano's saliva because a saliva test was not conducted.

Investigator Espinoza testified that he first spoke with E.C. at Estrellita's House, and he observed the forensic interview of E.C. that occurred at Estrellita's House. Investigator Espinoza stated that J.C. provided him with the letter that E.C. had written, which he recalled as being the letter that was contained in the State's records and that E.C. read in open court. Later, Investigator Espinoza made contact with Cano at his place of employment, a local air conditioning company. Cano's boss, Joe Sloss, did not wish for

8

Cano to be confronted at the job site, so Sloss arranged to transport Cano to an agreed upon location in Alton, Texas. When Investigator Espinoza first met him, Cano stated that he knew what the investigation was about. Cano then got into Investigator Espinoza's vehicle. Cano sat in the front seat of the vehicle, and Investigator Espinoza remembered Cano looking "down," as if he "was . . . thinking. His mind was going." Investigator Espinoza testified that Cano was not handcuffed nor was he under arrest at this point.

Investigator Espinoza provided Cano with a meal and a soda when they arrived at the sheriff's office. At this point, Cano indicated that he was willing to speak to police. Investigator Espinoza then read Cano his *Miranda* rights, which Cano expressed that he understood by initialing a written transcription of his *Miranda* rights. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). Investigator Espinoza proceeded to interview Cano and produced a written document chronicling the interview with Cano. Both Cano and Investigator Espinoza signed the document and represented that the document was true and accurate. Cano's statement, which was read into the record, provided the following:

> I have been married to [J.C.] for over twenty years now. We have three children . . . . I have had problems with my wife before. I was arrested for assaulting her. I completed the anger management courses[,] and the charges were dropped by the [S]tate. We argue every once in a while. I do not have a problem with alcohol or drugs. I can control everything that I do. Last night, I drank about 8 to 10 24oz. cans of Miller Lite beer. I was also doing some cocaine last night. I was watching television in the living room[,] which is also the room where my daughter, [E.C.], sleeps. I decided to go take a shower. When I got out of the shower[,] I went to bed. I decided to get out of bed because I needed to go to the bathroom. When I got out of the bathroom[,] I noticed that everything was very dark. I just began to think about going to touch my daughter, [E.C.]. [E.C.] was lying down on her stomach. I began to touch her legs and her behind (butt), but she did not react. I then pulled down her shorts and underwear. I was able to take her shorts and underwear off. I then began playing with her front part. I was using my index and middle fingers to put them inside of her front part. I then

9

began using my tongue to lick her front part[,] and I was kissing her front part. I call the vagina the front part. [E.C.] then woke up and told me to stop[,] so I stopped. I walked away and went to sleep in the bedroom with my wife. In the morning[,] my wife found a letter that my daughter, [E.C.], wrote to her. She [J.C.] confronted me about the letter[,] so I told her that I did do something and to do what[]ever she needed to do. I told her to call the police or what[]ever she wanted to do.

When he made this statement, Cano did not appear to be intoxicated or under the influence of any drugs, according to Investigator Espinoza. Furthermore, after giving his statement, Cano stated that he should "just shoot himself in the head" for what he did. Cano was then arrested and placed on suicide watch.

On cross-examination, Investigator Espinoza was asked by defense counsel about Cano's criminal history, to which Investigator Espinoza replied that Cano had committed numerous offenses, primarily involving the use and abuse of alcohol. On redirect examination, Investigator Espinoza recalled his encounter with J.C. regarding E.C.'s outcry. Investigator Espinoza testified that J.C. did not act surprised and did not seem protective of her daughter. Investigator Espinoza also testified that Cano himself volunteered the information in his statement regarding his alcohol and cocaine consumption on the night of the incident.

At the conclusion of the State's case-in-chief, the trial court granted a directed verdict for the defense with respect to the indecency with a child by exposure count contained in the indictment.

**B. Cano's Evidence**

As noted earlier, Cano called two witnesses to testify on his behalf—his brother-in-law, Esteban Espinoza, and Reyna. Esteban testified that in October of 2007, Cano and his family visited Esteban's house to watch a Monday night football game between the

Dallas Cowboys and the Green Bay Packers. Esteban recalled this meeting because he had asked Cano to come over earlier in the day to fix his air conditioning unit. Esteban testified that Cano arrived around 7:30 p.m. and that, shortly thereafter, Cano began drinking alcohol. By 11:30 p.m., Cano and his family left because Cano was getting agitated and appeared "somewhat drunk." On cross-examination, Esteban testified that Cano and his family came over to watch the football game on October 9, 2007, and that he was not aware of the alleged incident involving E.C., nor was he present when it occurred. On redirect examination, Esteban noted that Cano has a drinking problem and that his alcohol tolerance is very low.

Reyna testified that he is a licensed private investigator who investigated the Cano family's home. Reyna stated that the home was very dirty and in disarray and that the distance from the master bedroom and E.C.'s sleeping area is approximately seventeen feet. The defense then tendered various photographs of the inside of the house, which depicted, among other things, that E.C.'s bed was located in the living room and that the mattress upon which E.C. slept was several feet off the floor. The defense then rested.

At the conclusion of the trial, the jury returned a guilty verdict as to the three counts of aggravated assault, and the trial court granted the State's motion to dismiss the indecency with a child by contact count.

On October 3, 2008, Cano timely filed a motion for new trial and a motion in arrest of judgment. Cano filed a subsequent motion for new trial and motion in arrest of judgment on October 21, 2008. In the subsequent motions, Cano alleged that E.C. had recanted her testimony since the trial of this matter. In addition, Cano attached an affidavit executed by his sister, Elva E. Baumgartner, who averred, among other things, that Cano never

11

sexually abused her and that she had been told by E.C. that E.C. lied under oath during the trial because the prosecutor made her believe that if she did not testify against Cano, that E.C.'s mother would be placed in jail and that E.C. would end up in a foster home. The record does not contain a ruling on Cano's motions; therefore, they were overruled by operation of law. *See* TEX. R. APP. P. 21.8(a), (c). This appeal followed.

## II. ANALYSIS

In his third issue on appeal, Cano argues that the evidence is insufficient to sustain his convictions because the State did not submit sufficient evidence to corroborate Cano's extrajudicial statements made to Investigator Espinoza. Specifically, Cano contends that, excluding his extrajudicial statements, the State did not tender sufficient evidence to establish the corpus delecti of the underlying aggravated assault offenses. The State asserts that the record contains some evidence to corroborate Cano's extrajudicial statements; therefore, there is sufficient evidence to establish the corpus delecti of the aggravated assault offenses in this case.

### A. Cano's Extrajudicial Statements

#### 1. Applicable Law

It is well-settled that an extrajudicial confession or statement is insufficient to support a conviction absent corroboration. *Lott v. State*, 60 Tex. Crim. 162, 131 S.W. 553, 555 (1910); *Bordman v. State*, 56 S.W.3d 63, 71 (Tex. App.–Houston [14th Dist.] 2001, pet. ref'd). In fact, the court of criminal appeals has stated that "the rule has been construed to require independent evidence of the corpus delecti." *Gribble v. State*, 808 S.W.2d 65, 70 (Tex. Crim. App. 1990). "The term corpus delecti has been held to mean 'proof of the fact that the crime charged has been committed by someone.'" *Bordman*, 56 S.W.3d at 71 (quoting *Bridges v. State*, 172 Tex. Crim. 655, 362 S.W.2d 336, 337 (1962)). The

12

identity of the perpetrator of the crime is not a component of the corpus delecti; instead, the inquiry focuses only on the harm brought about by the criminal conduct of some person. *Gribble*, 808 S.W.2d at 70; *see Bordman*, 56 S.W.3d at 71; *see also Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997) (stating that under the corpus delecti rule, an extrajudicial confession, standing alone, is not enough to support a conviction; other evidence must exist showing that a crime has in fact been committed). The purpose of the corroboration requirement is to ensure that a person who confesses to a crime is not convicted without independent evidence establishing that the crime was indeed committed. *Gribble*, 808 S.W.2d at 71; *see Bordman*, 56 S.W.3d at 71.

"The quantum of independent evidence required to establish the corpus delecti which corroborates an extrajudicial confession need not be great." *Bordman*, 56 S.W.3d at 71 (citing *Damian v. State*, 881 S.W.2d 102, 106 (Tex. App.–Houston [1st Dist.] 1994, pet. ref'd)); *see Self v. State*, 513 S.W.2d 832, 835 (Tex. Crim. App. 1974); *see also Cason v. State*, No. 13-04-301-CR, 2005 Tex. App. LEXIS 5651, at *7 (Tex. App.–Corpus Christi July 21, 2005, no pet.) (mem. op., not designated for publication) ("While proof of the *corpus delecti* of an offense may not be made by an extrajudicial confession alone, proof of the *corpus delecti* need not be made independent of the extrajudicial confession.") (emphasis in original). "So long as there is some evidence which renders the corpus delecti more probable than it would be without the evidence," the purpose of the corroboration requirement has been satisfied. *Gribble*, 808 S.W.2d at 72; *see Wooldridge v. State*, 653 S.W.2d 811, 816 (Tex. Crim. App. 1983); *see also Williams*, 958 S.W.2d at 190 (holding that the corroborating evidence must render the commission of the offense

13

more probable, but does not have to be sufficient by itself to prove the offense).

**2. Discussion**

Here, E.C. testified that Cano consumed alcohol on the night in question. E.C. also testified that she awoke on the night in question when she felt something pushing against her. She observed Cano on top of her, her underwear and shorts at her feet, and Cano's shorts unzipped. E.C. recalled feeling Cano's penis going in and out of her "pussy" and behind and that her "pussy" felt wet after the incident. However, E.C. admitted that she did not actually see Cano's penis during the alleged sexual assault. In addition to E.C.'s testimony, J.C. testified that Cano consumes drugs and alcohol, and Esteban confirmed that Cano has a problem with alcohol consumption. Furthermore, Nelson noted that DNA tests on E.C.'s panties did not reveal any sperm, but the panties did contain the DNA of a male, who is likely related to E.C. Nelson acknowledged that the male DNA contained in E.C.'s panties could have been skin or saliva cells.

The above-mentioned testimony corroborates much, if not all, of Cano's extrajudicial statements. E.C.'s testimony that she felt Cano's penis moving in and out of her "pussy" and behind suggests that Cano penetrated E.C.'s sexual organ and her anus. E.C.'s admission that she never did see Cano's penis is not significant because the child victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (en banc); *see also Ozuna v. State*, 199 S.W.3d 601, 606 (Tex. App.–Corpus Christi 2006, no pet.). Furthermore, the penetration of E.C.'s "pussy" and anus could reasonably have been done by Cano's fingers, as he described in

14

his extrajudicial statements, or could have been accomplished by his penis. Additionally, E.C.'s testimony that her "pussy" felt wet after the incident and Nelson's testimony that the male DNA from E.C.'s panties could have been from skin or saliva cells constitutes some evidence that Cano caused his mouth to contact the sexual organ of a child under fourteen years old. This testimony supports a finding that Cano's extrajudicial statements were indeed true. *See Bible v. State*, 162 S.W.3d 234, 246 (Tex. Crim. App. 2006) (stating that the corpus delecti rule "was designed to prevent 'errors in convictions based upon untrue confessions alone'") (quoting *Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002)); *see also Gribble*, 808 S.W.2d at 71 ("[T]he essential purpose of the corroboration requirement is to assure that no person be convicted without some independent evidence showing that the very crime to which he confessed was actually committed . . . .").

Cano argues that the lack of direct medical evidence suggests that the State did not satisfy the corpus delecti rule. We do not find this argument persuasive because Texas courts have routinely held that there is no requirement that the victim's testimony be corroborated by medical or physical evidence. *See Ketchum v. State*, 199 S.W.3d 581, 590 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *Kemple v. State*, 725 S.W.2d 483, 485 (Tex. App.–Corpus Christi 1987, pet. ref'd)). Moreover, the court of criminal appeals has held that the corpus delecti rule need only be satisfied by "some evidence," not some *direct* evidence, which renders it more probable than not that a criminal offense was committed. *See Williams*, 958 S.W.2d at 190; *Gribble*, 808 S.W.2d at 72; *Wooldridge*, 653 S.W.2d at 816.

Based on the foregoing testimony, we hold that the State presented "some evidence

15

which renders the corpus delecti more probable than it would be without the evidence"; therefore, we conclude that the State sufficiently corroborated Cano's extrajudicial statements so as to satisfy the corpus delecti rule. *See Williams*, 958 S.W.2d at 190; *Gribble*, 808 S.W.2d at 72; *Wooldridge*, 653 S.W.2d at 816; *Bordman*, 56 S.W.3d at 71; *see also Cason*, 2005 Tex. App. LEXIS 5651, at *7. Accordingly, we overrule Cano's third issue.

## B.      Legal and Factual Sufficiency of the Evidence Supporting Cano's Convictions

By his first issue, Cano contends that the evidence supporting his convictions is legally and factually insufficient because E.C. testified that she was not sure whether Cano had assaulted her and there was no direct evidence of a sexual assault or penetration. We disagree.

### 1.      Applicable Law

In reviewing the legal sufficiency of the evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000,

16

pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for that of the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151. We resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, a court of appeals reviews the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or whether it is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). Unless the record clearly reveals that a different result is appropriate, we must defer to the fact finder's determination concerning the weight to be given to contradictory testimony. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.

17

Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). A hypothetically correct jury charge would ask the jury if Cano (1) on or about October 9, 2007, (2) intentionally or knowingly, (3) caused his finger to penetrate the sexual organ of E.C. and his mouth and sexual organ to contact the sexual organ of E.C., (4) who was then a child under fourteen years of age. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(1)(B)(iii), (a)(2)(B).

### 2. Discussion

At the outset of our discussion of this issue, we note that the testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005); *see Ozuna*, 199 S.W.3d at 606 (citing *Garcia*, 563 S.W.2d at 928). As noted earlier, courts give wide latitude to the testimony given by child victims of sexual abuse. *See Villalon*, 791 S.W.2d at 134. "The victim's description of what happened to him need not be precise, and he is not expected to express himself at the same level of sophistication as an adult." *Ozuna*, 199 S.W.3d at 606 (citing *Villalon*, 791 S.W.2d at 134).

Here, E.C. testified that at the time of the incident, she was thirteen years old. She also testified that she awoke during the night in question to find Cano on top of her and her shorts and underwear at her feet. E.C. recalled Cano thrusting his penis in and out of her "pussy" and behind and that her "pussy" was wet after the incident. E.C. stated that Cano's penis was soft; that he did not ejaculate inside of her; and that Cano's pants were unzipped when she awoke from her slumber. The lab tests confirmed the fact that Cano likely did not ejaculate inside of E.C. and that Cano did not use a condom or spermicide during the

18

incident. However, the lab tests also confirmed that male DNA was found in E.C.'s panties, and Nelson testified that the male DNA could have come from skin or saliva cells from one of E.C.'s relatives. In addition to E.C.'s testimony, Cano provided extrajudicial statements to police confessing to touching E.C.'s vagina and behind with his hands and kissing E.C.'s vagina on the night in question.

On the other hand, Cano directs us to E.C.'s testimony on cross-examination, where she stated that she was not entirely sure what had happened to her on the night in question. Cano also points to E.C.'s letter, wherein she again stated that she was unsure about what had happened, and to Mungia's medical examination, which appeared to be normal. However, as we noted earlier, there is no requirement that the victim's testimony be corroborated by medical or physical evidence; rather, a conviction can be sustained solely on circumstantial evidence. *See Guevara*, 152 S.W.3d at 49; *Garcia*, 563 S.W.2d at 928; *see also Ozuna*, 199 S.W.3d at 606; *Ketchum*, 199 S.W.3d at 590; *Kemple*, 725 S.W.2d at 485. Furthermore, the apparent inconsistencies in E.C.'s testimony on direct and cross-examination and the statements made in her letter were within the province of the jury to resolve. *See* TEX. CODE CRIM. PROC. ANN. arts. 36.13 (Vernon 2007), 38.04; *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). We defer to the jury's determination concerning what weight to be given to contradictory testimony unless the record clearly reveals that a different result is appropriate, which is not the case here. *See Lancon*, 253 S.W.3d at 705; *see also Johnson*, 23 S.W.3d at 8.

Reviewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence supporting Cano's convictions is legally sufficient. *See Jackson*, 443

19

U.S. at 318-19; *see also Laster*, 275 S.W.3d at 517. In addition, viewing the evidence in a neutral light, we cannot say that the jury's verdict is clearly wrong, manifestly unjust, or against the great weight and preponderance of the evidence. *See Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414. We therefore conclude that the evidence supporting Cano's convictions is factually sufficient. *See Lancon*, 253 S.W.3d at 704. Accordingly, we overrule Cano's first issue.

## C. Ineffective Assistance of Counsel

By his second issue, Cano argues that his convictions must be reversed because he received ineffective assistance of counsel. Specifically, Cano complains about defense counsel's apparent failure to object to "harmful and prejudicial" evidence of extraneous offenses, crimes, and bad acts presented by the State in its case-in-chief. The State counters by arguing that much of the evidence that Cano complains about was referenced in his own statement to police and that the evidence was submitted to establish a defense that Cano had gone to the wrong bed that night.

### 1. Applicable Law

To establish ineffective assistance of counsel, appellant must show that: (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for his attorney's errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984); *Dewberry v. State*, 4 S.W.3d 735, 757 (Tex. Crim. App. 1999) (holding that appellant must show a reasonable probability that, but for counsel's errors, the fact finder would have had

20

a reasonable doubt as to appellant's guilt); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). Whether this test has been satisfied is to be judged on appeal by the totality of representation, not by any isolated acts or omissions. *Jaynes*, 216 S.W.3d at 851. Cano has the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Cannon v. State*, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984)).

Our review of counsel's representation is highly deferential, and we will find ineffective assistance only if the appellant overcomes the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. The right to "reasonably effective assistance of counsel" does not guarantee errorless counsel whose competency is judged by perfect hindsight. *Saylor v. State*, 660 S.W.2d 822, 824 (Tex. Crim. App. 1983). Moreover, the acts or omissions that form the basis of appellant's claim of ineffective assistance must be supported by the record. *Thompson*, 9 S.W.3d at 814; *Jaynes*, 216 S.W.3d at 851. A silent record which provides no explanation for counsel's actions usually will not overcome the strong presumption of reasonable assistance. *Thompson*, 9 S.W.3d at 813-14. To warrant reversal without affording counsel an opportunity to explain his actions, "the challenged conduct must be 'so outrageous that no competent attorney would have engaged in it.'" *Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

### 2. Discussion

In this issue, Cano contends that his trial counsel was ineffective because he did

21

not object to the admission of evidence documenting Cano's arrest for assaulting J.C., his cocaine use, and his numerous other "jailings." Cano argues that the admission of this evidence was "mortally prejudicial to his case" in that the evidence had no probative value and was not relevant to the charged offenses. *See* TEX. R. EVID. 404(b)[4] (providing that extraneous acts are generally inadmissible at the guilt-innocence stage of trial).

The record does not contain an explanation from Cano's trial counsel regarding his trial strategy as it pertains to the admission of the evidence at issue. *See Thompson*, 9 S.W.3d at 813-14. However, in his opening statement, Cano's trial counsel explained that, on the night in question, Cano had consumed a large amount of alcohol, and he got up in the middle of the night to use the bathroom, which is located on the second floor of the family house. Trial counsel further explained that the house was very dark, and when Cano finished in the bathroom, he returned to the wrong bed—E.C.'s bed—because of the proximity of E.C.'s bed to the master bedroom. In his closing statement, Cano's trial counsel argued that the evidence, at worst, established that Cano went to the wrong bed, mistakenly lied on top of E.C., and then got off of her. Trial counsel's opening and closing statements seem to suggest a defense that Cano was not aware of his surroundings when he returned from the restroom because the house was very dark and Cano had consumed substances that may have affected his judgment on the night in question. With respect to the "jailings" evidence, Cano's own trial counsel elicited that testimony from Investigator Espinoza when asking about Cano's criminal history for violence or lack thereof; therefore,

---

[4] Rule 404(b) of the rules of evidence does allow for the admission of evidence of other crimes, wrongs, or acts for purposes other than proving the character of a person in order to show action in conformity therewith, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b).

22

an objection by Cano's trial counsel would not have been possible. Because the record is silent as to trial counsel's trial strategy, we presume that the trial strategy of Cano's trial counsel was sound. *See Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003); *Thompson*, 9 S.W.3d at 214; *see also Mitchell v. State*, No. 13-07-00236-CR, 2009 Tex. App. LEXIS 4137, at *13 (Tex. App.–Corpus Christi June 11, 2009, pet. ref'd).

In any event, Cano himself admitted in his statement to police that he had previously been arrested for assaulting J.C. and that he consumed alcohol and cocaine on the night in question. Thus, even if it was error for Cano's trial counsel to fail to object to the admission of this evidence, Cano has not adequately explained how the admission of this evidence caused the rendition of an improper verdict, especially in light of Cano's own confession provided to police. *See Strickland*, 466 U.S. at 684; *Dewberry*, 4 S.W.3d at 757; *Jaynes*, 216 S.W.3d at 851.

Assuming arguendo that it was error for Cano's trial counsel to not object to the admission of this evidence, because Cano failed to adequately explain how this evidence resulted in the rendition of an improper verdict in light of his confession to police, he has failed to satisfy the second prong of the *Strickland* test. *See Strickland*, 466 U.S. at 684; *Dewberry*, 4 S.W.3d at 757; *Jaynes*, 216 S.W.3d at 851. Therefore, in reviewing the record in its entirety and not focusing on isolated events, we conclude that Cano has failed to overcome the strong presumption of reasonable assistance. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851. Accordingly, we overrule Cano's second issue.

## D. Cano's Motion for New Trial

By his fourth issue, Cano argues that the trial court abused its discretion in not

granting his motion for new trial because Baumgartner averred in her affidavit that E.C.'s testimony at trial was false and that the testimony was fabricated and coerced by the State's prosecutors. The State contends that Cano did not timely file his motion for new trial asserting this contention. The State further contends that Cano's fourth issue really complains about the trial court's failure to hold a hearing on his motion for new trial and that Cano has inadequately briefed this issue.

### 1. Applicable Law

A trial court's denial of a defendant's motion for new trial is reviewed for abuse of discretion. *See Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *see also Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

> We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. Thus, a trial court abuses it discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.

*Charles*, 146 S.W.3d at 208.

The defendant generally has the burden of proof on a motion for new trial. *See Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995) (en banc). The proponent of the motion for new trial bears the initial burden of establishing facts entitling him to the relief sought. *See Marquez v. State*, 921 S.W.2d 217, 222 (Tex. Crim. App. 1996) (en banc). Furthermore, at the hearing on a motion for new trial, the trial court is the trier of fact and the sole judge of the credibility of the witnesses. *See Melton v. State*, 987 S.W.2d

24

72, 75 (Tex. App.–Dallas 1998, no pet.) (citing *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995)).

## 2.    Discussion

As a preliminary matter, the State argues that Cano's motions for new trial and in arrest of judgment were not timely filed.  The record indicates that Cano's appellate counsel filed his first motions for new trial and in arrest of judgment on October 3, 2008.  Cano's trial counsel filed second motions for new trial and in arrest of judgment on October 21, 2008.  However, Cano's appellate counsel certified, in a "Certificate of Presentment" that on September 30, 2008, "a true and correct copy" of his initial motion for new trial was hand-delivered to the trial court.  Cano's second motions contain a "Certificate of Presentment" section, which states that the motions were hand-delivered to the trial court on October 21, 2008.  However, the record does not reflect that the motions were set for a hearing or that the trial judge even saw these filings.

With respect to presentation of a motion for new trial, the court of criminal appeals recently stated that:

> A motion for new trial must be "presented" to the trial court within ten days of being filed.  The defendant must put the trial judge on actual notice that he desires the judge to take some action, such as making a ruling or holding a hearing, on his motion for new trial.  "Presentment" must be apparent from the record, and it may be shown by such proof as the judge's signature or notation on the motion or proposed order, or an entry on the docket sheet showing presentment or setting a hearing date.

*Gardner v. State*, No. AP-75,582, 2009 Tex. Crim. App. LEXIS 1441, at **71-72 (Tex. Crim. App. Oct. 21, 2009) (footnotes omitted).  The *Gardner* court further stated that "without any

25

showing that the trial judge actually saw appellant's motion for new trial, the judge cannot be faulted for failing to conduct a hearing on that motion." *Id.* at *73 (citing *Carranza v. State*, 960 S.W.2d 76, 79-80 (Tex. Crim. App. 1998)).

Because the record does not contain a ruling on Cano's motions nor a date setting the motions for a hearing, and because the docket sheet does not reflect that the motions were ever received by the trial judge, we agree with the State that Cano failed to properly present his motions to the trial judge and request a ruling. We therefore overrule Cano's issue pertaining to his motion for new trial to the extent that he complains about the trial court's failure to conduct a hearing on his motions for new trial and in arrest of judgment.

Next, we analyze Cano's primary argument in this issue. In making the argument that he is entitled to a new trial because E.C. allegedly offered false testimony at trial, Cano cites the Houston First Court of Appeals's opinion in *Yates v. State*, 171 S.W.3d 215, 221 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd). In *Yates*, the court of appeals stated the following:

> Generally, if a witness has testified to material, inculpatory facts against a defendant and, after the verdict but before a motion for new trial has been ruled upon, *the witness makes an affidavit that he testified falsely, a new trial should be granted. Williams v. State*, 375 S.W.2d 449, 451 (Tex. Crim. App. 1964). . . . We note that this rule does not require that the State have knowledge that the testimony was false. We review the record to determine whether the State used the false testimony and, if so, whether there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. *See Ramirez v. State*, 96 S.W.3d 386, 394-95 (Tex. App.–Austin 2002, pet. ref'd).

*Id.* (footnotes omitted) (emphasis added). This Court has recognized a few exceptions to this rule, including the instance where the recantation is found to be incredible in light of

26

the trial evidence. *Villarreal v. State*, 788 S.W.2d 672, 674 (Tex. App.–Corpus Christi 1990, pet. ref'd) (citing *Jones v. State*, 711 S.W.2d 35, 36-40 (Tex. Crim. App. 1986); *Williams*, 375 S.W.2d at 451).

Nevertheless, we do not find this rule to be applicable in this matter because the affidavit attached to Cano's motion for new trial was from his sister, Baumgartner, not E.C. herself. *See Yates*, 171 S.W.3d at 221. Baumgartner is clearly an interested party and, given E.C.'s testimony that several of Cano's family members pressured her to lie in open court, is probably more inclined to skew the truth to protect her brother, Cano, from prosecution. In addition, Baumgartner offered numerous hearsay statements as to the thoughts and impressions of E.C. even though E.C. was available to execute an affidavit or offer testimony. *See* TEX. R. EVID. 802 (providing that hearsay testimony is not admissible unless allowed by statute or an exception to the hearsay rule). Furthermore, the record does not reflect that Cano properly requested that a hearing be conducted on his motions for new trial, which would have afforded him the opportunity to flesh out the alleged factual inaccuracies in E.C.'s testimony. However, even if E.C. did offer false testimony at trial and even if E.C. was the one who executed the affidavit attached to Cano's motion for new trial, the jury was free to disbelieve any such recantation in light of Cano's own admission to police that he committed the charged offenses. *See Jones*, 711 S.W.2d at 36-40; *Williams*, 375 S.W.2d at 451; *Villarreal*, 788 S.W.2d at 674.

Based on the foregoing, we cannot say that Cano has met his burden in demonstrating that the trial court abused its discretion in denying his motions for new trial by failing to rule. *See Holden*, 201 S.W.3d at 763; *Charles*, 146 S.W.3d at 208; see also

27

*Marquez*, 921 S.W.2d at 222; *Patrick*, 906 S.W.2d at 498. Accordingly, we overrule Cano's fourth issue.

### III. Conclusion

Having overruled all of Cano's issues on appeal, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
Tex. R. App. P. 47.2(b)
Delivered and filed the
3rd day of June, 2010.